# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | FILED _____ LODGED |
|---|---|
| | _____ RECEIVED |
| | **Mar 17, 2022** |
| | CLERK U.S. DISTRICT COURT |
| | WESTERN DISTRICT OF WASHINGTON AT TACOMA |
| | BY _____ DEPUTY |

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )        Case No.   MJ22-5042
1900 NW 96th Street, Vancouver, Washington; and   )
116 E Cedarcrest Street, Napavine, Washington     )
                                                  )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846; | Distribution of controlled substances, possession with intent to distribute, and conspiracy |
| 18 U.S.C. § 1956 | Money laundering |

The application is based on these facts:

✓   See Affidavit of Samuel Landis, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Samuel Landis, Special Agent, Drug Enforcement Administration
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   _____03/17/2022_____          _____
*Judge's signature*

City and state:   Tacoma, Washington          Hon. David W. Christel, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF SPECIAL AGENT SAMUEL LANDIS

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF CLARK              )

I, Samuel Landis, a Special Agent with the Drug Enforcement Administration with having been duly sworn, states as follows:

## **AFFIANT BACKGROUND**

1.      I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since March of 2016. Currently, I work in the Seattle Field Division, Portland District Office. Prior to my employment with the DEA, I worked as a Border Patrol Agent from November 2009 to March 2016. As a Special Agent of the DEA, my duties and responsibilities have included conducting criminal investigations for possible violations of federal law, particularly those found in Title 18 and Title 21 of the United States Code.

2.      I received formal training at the DEA Basic Agent Training Academy in Quantico, Virginia. The 22-week training included comprehensive, formalized instruction in, among other things: basic narcotic investigations, drug identification and detection, familiarization with United States narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, and undercover operations. In addition to Basic Agent Training, I have completed Money Laundering Training, Traps and Concealed Compartments Training, and other various courses that have familiarized me with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances, and financial investigations.

3.      I have had the opportunity to monitor, listen to, review transcripts and line sheets (prepared by linguists) documenting the content of thousands of intercepted conversations involving the trafficking of heroin, methamphetamine, fentanyl, marijuana, and other controlled substances and illegal narcotics, by persons who used some form of code to thwart law enforcement. I also have also interviewed defendants at the time of their

1  arrests and have debriefed, spoken with, or interviewed numerous drug dealers or
2  confidential sources (informants) at proffer interviews who were experienced in speaking
3  in coded conversation over the telephone. In many of these interviews and debriefings, I
4  was able to speak with these drug traffickers about specific conversations in which they
5  were intercepted pursuant to electronic surveillance. From these interviews, and also from
6  discussions with other experienced agents, I have gained knowledge regarding the various
7  methods, techniques, codes, and/or jargon used by drug traffickers in the course of their
8  criminal activities, including their use of firearms to protect their narcotics related activities
9  and their use of cellular telephones and other electronic devices to facilitate
10  communications while avoiding law enforcement scrutiny.

11  ## INTRODUCTION AND PURPOSE OF AFFIDAVIT

12  4.     This Affidavit is submitted in support of an application to search the
13  following two locations, as further described in Attachments A-1 and A-2, for evidence,
14  fruits and instrumentalities of drug trafficking crimes committed by the drug trafficking
15  organization (DTO), in violation of Title 21, United States Code, Sections 841(a)(1),
16  843(b), and 846; and Title 18, United States Code, Sections 1956, as further described in
17  Attachment B.  The locations that I am requesting authorization to search are identified in
18  bold font throughout this Affidavit.

19  ## LOCATIONS TO BE SEARCHED

20  a.  Suspected drug stash location and residence of Genaro JACOBO-Velez:
21  **1900 NW 96th Street, Vancouver, Washington (Premises 1)**.

22  b.  Suspected money stash location and residence of Francisco VAZQUEZ
23  Ruelas: **116 E Cedarcrest Street, Napavine, Washington (Premises
24  2)**.

25  5.     The statements contained in this affidavit are based in part on your affiant's
26  training, experience, participation in and knowledge of this investigation, as well as
27  knowledge your affiant learned from various other federal, state and/or local law
28  enforcement agencies, special agents, task force officers, state and local law enforcement

AFFIDAVIT OF SAMUEL LANDIS - 2
USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  officers.  Since this Affidavit is being submitted solely for the purpose of establishing
2  probable cause to obtain this search warrant, your affiant has not included each and every
3  fact known to me concerning this investigation.  Rather, your affiant has only set forth facts
4  relevant to the question of whether probable cause exists to issue the requested search
5  warrant.

6  ## SOURCES OF INFORMATION

7  6.     Confidential Source 1 (CS-1) referenced herein has worked with the DEA
8  since 2004 and provides information in exchange for monetary consideration. For this
9  investigation, CS-1 has been paid less than $10,000. CS-1 has provided the DEA with
10  truthful and reliable information in the past, which has been independently corroborated
11  through DEA investigations. CS-1 has a criminal history that includes a conviction of more
12  than fifteen years old for fraudulent use of a credit card and a conviction of more than ten
13  years old for possession of cocaine. Additionally, CS-1 has provided reliable information
14  during 2020 to more than three different DEA offices, as well as to the United States
15  Marshal's Service. The information provided continued into 2021. Specific to this case, the
16  information CS-1 has provided on drug trafficking and other assistance has been
17  corroborated through physical surveillance and electronic recordings.

18  7.     Confidential Source 2 (CS-2) referenced herein has worked with the DEA
19  since 2015. CS-2 has prior criminal convictions for Resisting/Obstructing and Giving False
20  Identification to a Peace Officer in 1997, Importation of a Controlled Substance in 1999,
21  Importation   of   Methamphetamine   in   2000,   and   Possession/Purchase   of
22  Narcotics/Controlled Substances for Sale in 2006. CS-2 previously provided information
23  in the past to the DEA in exchange for reduced sentencing for criminal charges, and now
24  provides information to the DEA in exchange for money. For this investigation, CS-2 has
25  been paid less than $10,000 for the information provided related to this investigation. CS-
26  2 has provided reliable information in the past to the DEA that has been independently
27  corroborated and has led to past drug seizures and drug-related arrests. Because CS-2 has
28  provided reliable information that has been independently corroborated and has led to drug

AFFIDAVIT OF SAMUEL LANDIS - 3

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   seizures and drug-related arrests, I believe that CS-2 is a credible and reliable source of

2   information.

3                                    **BACKGROUND**

4       8.    In April 2021, DEA Portland agents began investigating a drug trafficking

5   organization (DTO) shortly after receiving information from CS-1 regarding a Portland-

6   based kilogram-quantity methamphetamine and heroin distributor. At that time, CS-1

7   provided agents with details of the persons s/he knew as Fidel GUILLEN Velez and Jose

8   GUILLEN-Ibarra. Agents later fully identified these individuals as Primitivo VELEZ-

9   Ibarra and Ricardo GUILLEN-Ibarra, respectively. According to CS-1, Primitivo VELEZ-

10  Ibarra leads and operates a methamphetamine and heroin DTO in the Greater Portland

11  Metropolitan area. Further, CS-1's information indicated that Primitivo VELEZ-Ibarra is

12  assisted by his family members in the distribution of controlled substances, to include his

13  brother, Ricardo GUILLEN-Ibarra; and his nephew, Genaro Alejandro JACOBO-Velez.

14      9.    CS-1's information also indicates that Primitivo VELEZ-Ibarra is a Mexican-

15  based distribution manager who has operational control over drug distribution cells located

16  in the Greater Portland Metropolitan area. Agents further learned that Primitivo VELEZ-

17  Ibarra was seeking out additional methamphetamine and/or heroin customers located in

18  Portland, Oregon. Based on this information, agents coordinated with CS-1 to introduce

19  Confidential Source-2 (CS-2) to the Primitivo VELEZ-Ibarra DTO as an individual

20  interested in purchasing methamphetamine and/or heroin in Portland, Oregon.

21      10.    Between April 2021 and August 2021, at the direction of agents, CS-2

22  arranged and conducted five different controlled purchases for methamphetamine, heroin,

23  and/or counterfeit oxycodone pills with JACOBO using Jacobo Phone-9076. On some of

24  the controlled purchases, Richard BARRERA would arrive and meet with CS-2 on behalf

25  of JACOBO. All of the controlled substances were purchased by CS-2 in exchange for

26  DEA issued funds. The controlled purchases totaled approximately three pounds of

27  methamphetamine, approximately two ounces of heroin and approximately 130 counterfeit

28  oxycodone pills suspected of containing fentanyl—both substances are schedule I & II

AFFIDAVIT OF SAMUEL LANDIS - 4

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

controlled substances respectively. All of the narcotics acquired from the controlled purchases have been sent to the DEA Western Regional Lab (WRL) for a qualitative analysis. Two of the methamphetamine evidence exhibits and the one heroin exhibit field-tested presumptive positive for their respective drug. Based on my training and experience, I know counterfeit oxycodone pills often times appear as small, round and blueish in color with "M/30" stamped on either side of each pill. I also know these illicit pills commonly contain fentanyl – a schedule II controlled substance. Further, these illicit pills are mostly derived from Mexico and are transported and distributed throughout the Pacific Northwest. Before and after each controlled purchase, agents met with CS-2 at a predetermined neutral location. During that time and for each of the controlled purchases, agents searched CS-2's person and vehicle to ensure CS-2 was not introducing any firearms, drugs and/or bulk cash at the meet location; none were found.

11.     On August 31, 2021, JACOBO travelled north from California into the District of Oregon while driving a Hyundai Sonata. Agents followed JACOBO to Portland, where he left the vehicle unoccupied. There, agents arranged to have a narcotics detecting K-9 deployed near and around the Sonata. This resulted in a positive alert to the presence of the odor of narcotics near the vehicle. Agents subsequently seized the Sonata and acquired court authorization to search the vehicle. On September 1, 2021, during a lawful[1] search of the vehicle, agents located and seized approximately 1816.6 gross grams of substance suspected to be heroin and $5,029 in United States currency. The substance was sent to the DEA WRL for a qualitative analysis. The results were positive for heroin. Thereafter, as described below, agents sought authorization to intercept communications over JACOBO's cellphone.

12.     To date, investigators have identified multiple individuals involved with the DTO, to include Primitivo VELEZ-Ibarra, Ricardo GUILLEN-Ibarra, Roberto

---

[1] On September 1, 2021, the Honorable Stacie F. Beckerman, United States Magistrate Judge, District of Oregon, signed a search warrant allowing agents to search a 2011 Hyundai Sonata displaying Oregon license plate 725LRK (3:21-MC-00966).

AFFIDAVIT OF SAMUEL LANDIS - 5

USAO: 2020R00108

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

VASQUEZ-Ramirez, Nansi ALEJANDRE, Genaro JACOBO-Velez, Kain TORRES-Guerrero, Javier LOPEZ-Vasquez, Kimberly PESANTEZ-Carlos, Jose QUINONES-Torres, Nestor NAVARETTE-Salas, David CASANOVA, Melissa PARRISH, Pedro CABRERA-Chavez, Alfredo VAZQUEZ-Arreola, Richard Antonio BARRERA, Alejandro URRUTIA-Avila, Brian ARROYO-Avelino, and others as active members within the DTO.

## FEDERAL WIRETAPS

13. On January 3, 2022, agents obtained a Title-III intercept order signed by United States District Court Judge Karin J. Immergut, District of Oregon, in Case Number 3:22-MC-09, authorizing the interception of wire and electronic communications, to include text messages to and from 323-627-4047 (Target Cellphone-1 or TC-1), used by Genaro JACOBO-Velez. The order was executed on January 3, 2022, and intercepts were terminated on February 2, 2022.

14. On February 3, 2022, agents obtained a Title-III intercept order signed by United States District Court Judge Karin J. Immergut, District of Oregon, Case Number 3:22-MC-09, authorizing the interception of wire and electronic communications, to include text messages from 360-998-7386 (Target Cellphone-2 or TC-2), used by Kain TORRES-Guerrero (K. TORRES). The order was executed on February 3, 2022, and intercepts terminated on March 4, 2022.

## SUMMARY OF PROBABLE CAUSE

**A.    Premises 1 – 1900 NW 96th Street, Vancouver, Washington**

15. On January 4, 2022, at approximately 2:40 p.m., agents intercepted an outgoing call (Session 105) from Kain TORRES-Guerrero (K. TORRES), using TC-2, to JACOBO, using TC-1. The call occurred in Spanish and was translated into English by DEA-contracted Spanish-speaking linguists.[1] During the call, JACOBO asked K.

---

1 Unless otherwise noted, all calls listed in this affidavit occurred in Spanish and were translated into English by DEA-contracted Spanish-speaking linguists.

AFFIDAVIT OF SAMUEL LANDIS - 6

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET,  SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TORRES, *"Um... listen, man. Um, bro, do you have, do you have a few of the blue ones?"* JACOBO then said, *"Shit. Uh-huh. No, I only needed a boat man. It's because… but I was going to tell you to lend it to me, man."* JACOBO later continues with, *"Because it's for, it's not for me. It's for another friend of mine. But I would be responsible for it if anything were to happen."* Based on my training, knowledge and experience I know drug traffickers use coded and/or vague language to describe their illicit activities in order to avoid law enforcement detection. From this, I believe when JACOBO asked K. TORRES for "blue ones" he used coded language to describe counterfeit oxycodone pills suspected of containing fentanyl.  I believe this is true because the pills are bluish color. Additionally, when JACOBO told K. TORRES he needed a "boat," I know from my training and experience from previous drug investigations that the use of the term "boat" is coded language used by drug traffickers to describe a specific quantity (1000) of counterfeit oxycodone pills suspected of containing fentanyl. I believe JACOBO used the terms "blue ones" and "boat" to describe the type and quantity of pills desired. The two ultimately agreed to arrange a meeting at a later time.

16.    That same day, at approximately 3:11 p.m., agents intercepted an outgoing call (Session 117) from JACOBO, using TC-1 to Jose QUINONES-Torres (QUINONES), using Quinones Phone-1353. During call, JACOBO initially told QUINONES he needed to go to California. Then JACOBO told QUINONES, *"Fuck. It's because, here's, here's the deal man…"* and continues with, *"I need the buttons, man, for the shirt.  Yeah, I need a… they're gonna, they're gonna need the… the shirt by, by tomorrow they want it, man."* Based on my training and experience, I know drug traffickers use coded and/or vague language to describe their illicit activities. I also know from my training and experience, and from previous drug investigations, that the term "button" is commonly used by drug dealers to describe fentanyl pills. Based on this conversation, I believe when JACOBO used the term "buttons" he meant counterfeit oxycodone pills suspected of containing fentanyl, given their similar shape and small size to a button. I also believe JACOBO indicated that his drug customer(s) were in "need" or "wanted" a supply of the illicit pills.

AFFIDAVIT OF SAMUEL LANDIS - 7

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

JACOBO goes on to tell QUINONES that he called *"The K."* Based on the surrounding intercepted communications described herein, I believe JACOBO was referring to K. TORRES. The conversation continued with QUINONES stating, *"That fool is in Vegas."* JACOBO asked, *"To pick up?"* which, through my training and experience, I recognize as coded or vague language to describe retrieving a drug supply. QUINONES affirmed by stating, *"Yeah."*

17.     On January 5, 2022, the Honorable Jolie A. Russo, United States Magistrate Judge, District of Oregon, signed a warrant (3:22-MC-00011) authorizing agents to obtain geolocation data pertaining to TC-2. That same day at approximately 1:41 p.m., agents began receiving geolocation data for TC-2 and learned that K. TORRES' device was positioned in Las Vegas, Nevada.

18.     On January 6, 2022, at approximately 4:30 p.m., agents intercepted an outgoing text message (Session 366) from JACOBO, using TC-1, to K. TORRES, using TC-2. JACOBO stated, *"What's up, dude? When are you back?"* Based on my training and experience in conjunction with the above intercepted communications, I believe JACOBO asked K. TORRES when he planned to return to Oregon. I further believe JACOBO asked because he intended on purchasing counterfeit oxycodone pills from K. TORRES.

19.     At approximately, 9:41 p.m., through geolocation data from TC-2, agents learned K. TORRES was located near the Portland International Airport (PDX Airport). Agents subsequently established surveillance in the area of K. TORRES' residence in Vancouver, Washington.

20.     At approximately 10:41 p.m., agents observed a light-colored 2015 Chevrolet Equinox (Equinox) park in the visitor lot of the apartment complex. I recognized K. TORRES in the back seat of the vehicle because the dome light illuminated the rear cab. I observed three individuals occupying the vehicle. However, I was only able to positively identify K. TORRES at that time. The three individuals sat in the car smoking and chatting for roughly thirty minutes. Agents also noted that geolocation data from TC-2 travelled

AFFIDAVIT OF SAMUEL LANDIS - 8

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

from the PDX Airport and to the area of TORRES' residence. The device was positioned at TORRES' residence at the same time K. TORRES was observed entering the area. Further, TC-2 maintained it positioning near K. TORRES' location during the time agents observed him in the back seat of the Equinox.

21.    At approximately 10:56 p.m., K. TORRES, using TC-2, replied to JACOBO, using TC-1, with a text message (Session 397) stating, *"I barely arrived, dude,"* indicating K. TORRES arrived in the Greater Portland, Oregon Metropolitan area.

22.    At approximately 10:57 p.m., agents received an outgoing call (Session 400) from JACOBO, using TC-1, to K. TORRES, using TC-2. During the call, K. TORRES initially stated, *"I'm back, dude. Already. Just now."* JACOBO said, *"...It's 'cause, um, so, you know that I told you that I was going to need some."* Here, based on JACOBO asking K. TORRES for some "blue ones" or counterfeit oxycodone pills as described in Session 105 above, I believe JACOBO was referencing that he was interested in obtaining counterfeit oxycodone pills from K. TORRES. JACOBO added, "*I need two of them, fool. But, look, this is the thing, dude*" and follows up with, *"Basically, dude. Like, the deal would be like this...if you could let me borrow them."* K. TORRES replied, *"Uh-huh. Yes, dude. I'll let you borrow them, dude."* Based on my training and experience, as well as the context gathered from Session 105 above, when JACOBO said he needed "two," he meant he needed two thousand counterfeit oxycodone pills. Further, when JACOBO asked if he could "borrow them," I believe JACOBO meant that he would pay for the counterfeit pills at a later time, to which K. TORRES agreed.

23.    The conversation transitioned when JACOBO stated, *"I have waters too, dude."* Through my training and experience, I recognize the term "water" as being consistent with how drug traffickers describe methamphetamine, given its translucent appearance. K. TORRES responded with, *"That's awesome that you're telling me, dude. Because, honestly, the, the, the, the, the chick is needing some and she's a bit upset, dude. That I haven't gotten her any."* Here, based on my training, knowledge and experience, I believe K. TORRES indicated that he was interested in acquiring methamphetamine so he

could provide it to an unknown female. JACOBO and K. TORRES then go into details about pricing. K. TORRES asked, *"Twenty-four, right?"* JACOBO responded, *"Yeah, dude, twenty-four."* Based on my training, knowledge and experience, I know drug traffickers use coded and/or vague language to describe their illicit activities. I am also aware of the current market pricing of methamphetamine. From this, I believe JACOBO agreed to sell K. TORRES a pound of methamphetamine in exchange for $2,400. I further believe, K. TORRES intended on obtaining the methamphetamine in order to redistribute to the unknown female. The two ultimately decide to talk at a later time.

24.    On January 7, 2022, at approximately 8:48 a.m., agents intercepted an outgoing call (Session 413) from JACOBO, using TC-1, to K. TORRES, using TC-2. During the call, JACOBO said, *"So can I, can I get those real quick, or what?"* K. TORRES replied, *"Yeah, dude, get over here, dude."* JACOBO then said, *"On Burton. Okay, I'll get over there, dude. I'm on my way."* Based on my training and experience in conjunction with the context provided in Sessions 400 and 405, I believe JACOBO and K. TORRES agreed to meet for the purpose of a 2,000 counterfeit oxycodone pill transaction. I further believe the two agreed to meet at an unknown place located just off NE Burton Road in Vancouver, Washington, given that it is in close proximity to K. TORRES' residence, where K. TORRES stayed overnight.

25.    Thereafter, agents learned TC-1's geolocation data showed JACOBO positioned at NE Burton Road near TORRES' residence between 8:46 a.m. and 9:01 a.m. TC-2's geolocation data showed K. TORRES mobile at 8:41 a.m. near the area of NE Burton Road as well. At approximately 8:56 a.m., TC-2's geolocation data showed K. TORRES back at his residence. From this, and through my training and experience, I believe JACOBO met K. TORRES, at an unknown location off NE Burton Road, for the purpose of obtaining 2,000 counterfeit oxycodone pills, suspected of containing fentanyl, for the purpose of further distribution. Additionally, following the illicit pill transaction, geolocation data from TC-1 showed JACOBO return to **Premises 1** at approximately 9:16 p.m. Further, mounted camera footage at **Premises 1** showed JACOBO returning to

AFFIDAVIT OF SAMUEL LANDIS - 10

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   **Premises** 1 around that same time. Due to the low-light conditions, agents were not able
2   to see if JACOBO was carrying anything when he returned to **Premises 1**. However,
3   through my training and experience, I know an amount like 2,000 pills is small enough to
4   be concealed in pants or shirt pockets.  From this, I believe JACOBO stored the suspected
5   2,000 illicit pill at **Premises 1**. I also believe the suspected methamphetamine JACOBO
6   spoke of in Session 400 was being stored at **Premises 1**.

7        26.   On January 7, 2022, at approximately 8:57 a.m., agents intercepted an
8   outgoing call (Session 423) from JACOBO, using TC-1, to QUINONES, using Quinones
9   Phone-1353. During the call, JACOBO told QUINONES, *"Let's send the box, dude."*
10   QUINONES asked, *"Which one? The weed one?"* JACOBO clarified, *"The other one that*
11   *I have here, dude."* JACOBO added, *"I'm going to open it and I'm going to put inside the*
12   *other shit, dude. Might as well."* The two go on to talk about plans to send the box out that
13   same day. However, agents did not receive any additional indication as to whether
14   JACOBO and/or QUINONES actually mailed the box that day. Based on my training,
15   knowledge and experience, I know "weed" is a common term used to describe marijuana.
16   Further, I know drug traffickers use coded or vague language to describe their illicit
17   activities. From this, when JACOBO said he was going "to put inside the other shit," I
18   believe JACOBO was referring to placing a separate drug other than marijuana inside of
19   the box.

20        27.   January 10, 2022, at approximately 9:26 a.m., agents intercepted an incoming
21   call (Session 600) from QUINONES, using Quinones Phone-1353, to JACOBO, using TC-
22   1. During the call, QUINONES indicated that he was on his way back to Vancouver,
23   Washington from his workplace. JACOBO asked QUINONES, *"How long do you think?"*
24   and added, *"Because I'm already done with the box…"* QUINONES subsequently told
25   JACOBO he was *"forty, fifty"* minutes away. JACOBO ended the conversation with,
26   *"…Hurry up, then. Bye."* Based on my training and experience as well there being no
27   indication that JACOBO and/or QUINONES sent the box mentioned in Session 423 above,
28   I believe JACOBO was speaking about the same box during Session 600, which is believed

AFFIDAVIT OF SAMUEL LANDIS - 11

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET,  SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  to contain narcotics. I further believe JACOBO arranged to meet with QUINONES upon
2  QUINONES' return to Vancouver.

3      28.     At approximately 9:43 a.m., agents intercepted a series of text messages
4  between TC-1, used by JACOBO, and Quinones Phone-1353, used by QUINONES.
5  JACOBO initiated the series with a message (Session 601) stating, *"6715 NE 63rd Street,*
6  *Unit 103, Vancouver, WA 98661, United States."* Moments later, JACOBO sent and
7  additional text message (Session 603) to QUINONES, which stated, *"How long."*
8  QUINONES replied (Session 612) with a text message stating, *"20 min."* Of note, at
9  approximately 9:51 a.m., through mounted camera footage at **Premises 1**, agents observed
10 JACOBO exit **Premises 1** carrying a large cardboard box and placing it in the trunk of his
11 Subaru Legacy (Subaru). JACOBO departed **Premises 1** shortly thereafter.

12     29.     At approximately 10:05 a.m., I arrived in the area of 6715 NE 63rd Street,
13 Unit 103, Vancouver, Washington. This address belongs to a "The UPS Store" location.
14 Upon my arrival, I observed JACOBO sitting in the driver's seat of his Subaru with the
15 window down and talking to QUINONES. QUINONES was standing outside the Subaru
16 and talking to JACOBO. A few minutes later, I observed QUINONES walk to the rear of
17 the Subaru. The trunk subsequently popped opened and QUINONES retrieved a large,
18 brown-colored cardboard box, roughly the size of QUINONES' torso. See Figure 1.
19 QUINONES carried the box into the UPS Store.



24     30.     At approximately 10:11 a.m., agents received an outgoing call (Session 618)
25 from JACOBO, using TC-1, to QUINONES, using Quinones Phone-1353. During the call,
26 JACOBO told QUINONES, *"Next day delivery, man."* QUINONES replied, *"Yeah*
27 *alright."* Here, I believe JACOBO told QUINONES to ship the box via overnight shipping.
28 At approximately 10:16 a.m., I observed QUINONES exit the UPS Store empty-handed

AFFIDAVIT OF SAMUEL LANDIS - 12

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and return to the Subaru. QUINONES sat in the front passenger-side of the Subaru with
2   JACOBO and the two individuals departed the area a couple minutes later.

3        31.     On the same day, Special Agent Alexander Laub and I contacted the manager
4   at The UPS Store and served an Administrative Subpoena. Agents requested to see a list
5   of parcels that were dropped off at The UPS Store on January 10, 2022, that were scheduled
6   for overnight shipping. Management honored the Administrative Subpoena and allowed
7   agents to look at packages scheduled for overnight shipment. The packages were present
8   in plain view behind the front desk. I recognized one of the cardboard boxes (Subject
9   Parcel) as being similar in shape, size and color to the one I observed QUINONES retrieve
10  from JACOBO's Subaru earlier that same day. Upon further examination of the shipping
11  label displayed on the Subject Parcel, I learned the sender was listed as "Josue Delatorre"
12  with a phone number of "314-788-1353." I recognized this phone number as the same
13  number JACOBO used to contact QUINONES over TC-1 as described above. Based upon
14  this information, agents coordinated with UPS to have the parcel intercepted and put aside.

15       32.     On January 11, 2022, agents coordinated with UPS's security team to retrieve
16  the Subject Parcel from a UPS warehouse in Vancouver, Washington. Agents seized the
17  Subject Parcel and transported it to an FBI Safe Streets Task Force (FBI SSTF) secure
18  location in Vancouver, Washington. There agents arranged to have Washougal Police
19  Department K-9 Officer Kyle Day assist with his trained narcotics detecting K-9 partner.
20  It is worth noting, Officer Day's K-9 partner is trained to detect the presence of the odor
21  of heroin, methamphetamine and cocaine and is not trained to detect the presence of the
22  odor of marijuana. Officer Day's K-9 partner subsequently alerted to the presence of
23  narcotics near the Subject Parcel.

24       33.     On January 12, 2022, the Honorable Stacie F. Beckerman, United States
25  Magistrate Judge, District of Oregon, signed a warrant (3:22-MC-00039) authorizing a
26  search of the Subject Parcel. During a subsequent search, agents located nine individually
27  vacuumed sealed bags containing marijuana weighing a total of 4,516.2 gross grams.
28  Agents also found a "Downy Unstoppables" container, an in-wash scent booster, filled with

AFFIDAVIT OF SAMUEL LANDIS - 13

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

blueish-colored scented pellets. Within the container was a vacuum-sealed bag containing what I recognized as counterfeit oxycodone pills comingled with the scented pellets. I know from my training and experience, as well as from other drug investigations, that counterfeit oxycodone pills, suspected of containing fentanyl pills, often times appear small, round and blueish in color with "M/30" stamped on either side of each pill, similar to the ones located in the aforementioned vacuum sealed bag. The pills weighed a total of 170.4 gross grams. The drugs were processed as evidence and shipped, via FedEx, to the Western Regional Lab for storage and safekeeping.

34.     Based on the intercepted communications between K. TORRES and JACOBO described above in conjunction with my training and experience, I believe the counterfeit oxycodone pills containing fentanyl that agents located in the Subject Parcel were the same illicit pills obtained by JACOBO from K. TORRES on January 7, 2022. Based on mounted camera footage at **Premises 1** showing JACOBO carrying the Subject Parcel from **Premises 1** and to his vehicle, I further believe the marijuana and the illicit pills were derived from storage at **Premises 1** and that JACOBO uses **Premises 1** to store his illicit narcotics and proceed thereof.

35.     Presently and as recently as March 14, 2022, through mounted camera footage at **Premises 1**, agents have observed JACOBO residing at **Premises 1**. JACOBO has consistently stayed overnight at **Premises 1** for an extended period of time. Further, court-authorized geolocation data pertaining to JACOBO's cellphone, 307-343-5333, maintains consistent overnight stays at **Premises 1**.

**B.     Premises 2 – 116 Cedar Crest Place, Napavine, Washington**

36.     On February 12, 2022, at approximately 10:52 a.m., K. TORRES using TC-2 received a call from 52-332-634-6441 (Lopez Phone-6441), used by Javier LOPEZ-Vasquez. During the conversation, LOPEZ asked K. TORRES, *"How much paper did you end up gathering? Because my buddy is telling [PH] me that there's a girl that wants to collect the paper."* TORRES replied, *"Um, well let me count it well."* Later during the

AFFIDAVIT OF SAMUEL LANDIS - 14

USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conversation LOPEZ told K. TORRES, "*Where is, where is, um, Australia? Or what's it called? No, Australia, or what did he/she say? Australia? No, no. Not Australia. Um…Australia. He/She said she was in Australia, who knows what, in Vancouver. Australia?*" K. TORRES replied, "*Okay, let me count it well.*" LOPEZ then finished the call by stating, "*Yeah. If you want, if you want, count it. Count it there right now so that, that I could park you guys somewhere so you can see her.*"

37.     Based on my training, knowledge and experience, I know drug traffickers rarely use plain language, but instead use vague language, coded jargon, and/or slang when referencing drug distribution or activities related to it in order to avoid detection by law enforcement. When LOPEZ asked K. TORRES, "*How much paper did you end up gathering?*" I believe LOPEZ is using coded language to describe money or currency that was earned from selling narcotics. LOPEZ continued by saying "*…my buddy is telling [PH] me that there's a girl that wants to collect the paper.*" I further believe LOPEZ was speaking about an unidentified female who intended on collecting the "*paper*" on behalf of LOPEZ's friend.

38.     At approximately 11:21 a.m., K. TORRES, using TC-2, called LOPEZ, using 971-895-6595 (Lopez Phone-6595). K. TORRES started the call by telling LOPEZ, "*Hey! Uh, I have twenty two (22) four hundred (400).*" LOPEZ responded with, "*Well, I feel like, like you should take the twenty two (22).*" Right? Once and for all to, to pay the one (1) and, and they could give us the other half, so we could owe the half and all of that would be left for us. Right?*" Both subjects continued the conversation about what was owed to them from their drug-customers base. At the end of the call LOPEZ told K. TORRES again, "*...So then uh… so then, uh… Complete the twenty two (22), let's order the twenty two (22), fuck it all…*"

39.     Based on my training, knowledge, and experience, I believe K. TORRES was giving LOPEZ the final count of the money (i.e., drug proceeds) and explained that he was in possession of $22,400. LOPEZ then directed K. TORRES to "*take the twenty two (22)." "Right? Once and for all to, to pay the one (1) and, and they could give us the other half,*

1  *so we could owe the half and all of that would be left for us. Right?"* LOPEZ told K.

2  TORRES to take "22" or $22,000 and pay the one, then K. TORRES could receive the

3  other half. Additionally, based on my previous knowledge of this case through intercepted

4  communications over TC-2, I know that K. TORRES primarily sells heroin and counterfeit

5  oxycodone pills. When LOPEZ told K. TORRES to pay the "one," I believe LOPEZ was

6  referring to a one-kilogram debt that was owed to the organization. I recognize $22,000 as

7  being consistent with the approximate wholesale price point of a kilogram of heroin in this

8  region. Furthermore, LOPEZ stated they could then receive the "half." I believe the "half"

9  is in reference to one half of a kilogram or a half-kilogram of heroin.

10      40.    At approximately 12:21 p.m., K. TORRES, using TC-2, received another

11  phone call from LOPEZ, using Lopez Phone-6441. During the call, LOPEZ stated, *"The

12  girl is there but, she doesn't know her way around. They don't know their way around.

13  Um… Do I send her an address? Or send me and address to send it, no? Hello?"* K.

14  TORRES responded by saying, "*Uh, do I send you the address of here, of the apartments?"*

15  LOPEZ ended the call by telling K. TORRES, *"There? There, to the three thousand

16  (3,000)? Uh. Let me look for it then and I'll, I'll send it."* From previous knowledge of this

17  investigation and my knowledge K. TORRES' residence at that time, I know that the

18  "3000" address is in reference to K. TORRES apartment complex, which has a listed

19  address of 3000 NE 109th Ave, Vancouver, Washington. I believe LOPEZ then directed

20  the "girl" who was supposed to retrieve the money from K. TORRES' at his apartment

21  complex.

22      41.    At approximately 12:45 p.m., K. TORRES, using TC-2, received a phone

23  call from LOPEZ, using Lopez Phone-6595. During the call, LOPEZ told K. TORRES that

24  the female was present at his residence and stated, *"She said she went in on the right hand

25  side. A little Honda… or, gold color, or who knows what she said."* K. TORRES then said

26  he was on his way and agreed to give the unidentified female, "22," or $22,000 derived

27  from the sales of narcotics.

28

AFFIDAVIT OF SAMUEL LANDIS - 16
USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

42.     At approximately 12:50 p.m., agents established surveillance in the area of K. TORRES' apartment. K. TORRES was then observed walking from the direction of his apartment and toward the front visitor's parking lot of the complex. K. TORRES was carrying a grey-colored handbag and was holding his cellphone to his ear as he walked eastbound through the parking lot and to a gold-colored Honda sedan. Moments later, agents observed the gold-colored Honda sedan, exit the area of TORRES' apartment complex.  Agents followed the Honda as it departed the area. Through a law enforcement database check, agents learned the vehicle's registration returned to Artemio HERNANDEZ (A. HERNANDEZ) of 1610 Windsor Ave, Centralia, Washington. Furthermore, during the initial communications with LOPEZ that day, LOPEZ though the unidentified female was traveling from "Australia." I believe LOPEZ actually meant "Centralia" given the similarity of pronunciation.

43.     At approximately 12:54 p.m., K. TORRES, using TC-2, called LOPEZ, using Lopez Phone-6595. K. TORRES told LOPEZ that he saw *"her"* in the *"old Honda."* LOPEZ replied, "*Oh. That girl, that girl only goes over there, up there for paper and that's it.*" K. TORRES stated, *"Uh-huh. Yes because she didn't give me anything…"* LOPEZ proceeded to tell K. TORRES "*No, no, no. The, the other one is going to give you the half…"*

44.     Based on my training, knowledge, and experience, I know that DTOs are compartmentalized within their overall operations and oftentimes separate money and drugs. When LOPEZ told K. TORRES, "that *girl only goes over there, up there for paper and that's it,"* I believe LOPEZ was explaining that the unidentified female only handles the money derived from the sales of drugs. LOPEZ further explained, "*the other one is going to give you half."* Here, I believe LOPEZ demonstrates the compartmentalization of the DTO by stating the unidentified female's role was specifically to take the money and that a separate unidentified individual would supply K. TORRES with the "half." As previously mentioned, I believe a "half" to be a half-kilogram of suspected heroin.

AFFIDAVIT OF SAMUEL LANDIS - 17
USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

45.     At approximately 2:20 p.m., agents followed the Honda exiting Interstate I-5 and to **Premises 2**. Almost immediately after arrival of the Honda, a purple-colored Chevrolet Malibu (Malibu) displaying Washington license plate "BNV3147" arrived at **Premises 2**. Through a subsequent law enforcement database check, agents learned the Malibu's vehicle registration returned to Francisco VAZQUEZ-Ruelas and the address of **Premises 2**. Agents confirmed VAZQUEZ-Ruelas' identity as the driver of the Malibu by comparing their visual observations with Francisco VAZQUEZ-Ruelas' driver's license. They are one and the same.

46.     During the same time the surveillance was occurring at **Premises 2**, agents from the DEA Tacoma Office checked the registered address of the Honda, which is 1610 Windsor Ave. Through visual surveillance at **Premises 2**, agents located a number of vehicles including a Silver Ford Mustang bearing Washington registration of "AYR2649," registered to Fredy HERNANDEZ (F. HERNANDEZ). Agents also located a Ford Edge bearing Washington registration of "BCS7690," registered to F. HERNANDEZ. Agents located and observed Washington driver's license photos of both subjects.

47.     Through a comparison of agents observations and F. HERNANDEZ's Washington Driver's License, agents identified the driver of the Honda as F.HERNANDEZ. Agents then watched F. HERNANDEZ exit the Honda along with the unidentified female passenger. Agents observed F. HERNANDEZ walk to the trunk of the vehicle and remove the same bag K. TORRES was carrying to the Honda earlier that same day. F. HERNANDEZ carried the bag into **Premises 2**. Agents maintained surveillance in the area for approximately an hour, and no further activity occurred at the residence.

48.     Later, through law enforcement database checks, agents learned the Ford Mustang and the Ford Edge identified at 1610 Windsor Ave were owned by "Luque's Auto Sales," located at 1440 S Gold St, Centralia, Washington. Through an additional law enforcement database check, agents learned Luque's Auto Sales has been previously identified in at least two past DEA investigations, dated from 2010 and 2016 respectively. These investigations indicate that Luque's Auto Sales is a business believed to be involved

in the laundering of proceeds derived from the sales of drugs. Through my training and experience, I have learned that establishments, similar to Luque's Auto Sales, use legitimate business practices as a way to cover for the influx of drug proceeds into their business.  This allows the businesses to send money back to Mexico on behalf of a DTO.

49.     Additionally, on March 16, 2022, agents conducting surveillance near **Premises 2** observed two vehicles located at **Premises 2**. Through a subsequent law enforcement database check, agents learned both vehicles were registered to VAZQUEZ and listing the same address as **Premises 2**. Based on the foregoing, I believe that K. TORRES provided F. HERANDEZ and the unidentified female with $22,000 in drug proceeds in order to pay a drug debt. I also believe those proceeds were taken to **Premises 2** for storage in preparation to be laundered back to Mexico. Based on my training, knowledge, and experience, I believe **Premises 2** is being used by the DTO as a location to store bulk cash derived from the sales of drugs.

## C.     PERTINENT KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

50.     Your affiant knows based on his training and experience that methamphetamine, cocaine, and heroin are controlled substances under the Controlled Substances Act.  In your affiant's experience, and the experience of other law enforcement agents involved in this investigation, the illicit distribution of such controlled substances is frequently a continuing activity that occurs over months and/or years.

51.     Based on your affiant's training and experience, and participation in this investigation, as well as numerous other investigations involving the illegal trafficking of controlled substances, your affiant knows:

    a.     That drug traffickers and associates who work with them maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business, or as drug proceeds;

    b.     That drug traffickers known to traffic in one form of illegal drug, such as methamphetamine, often will also traffic in other illegal drugs, such as cocaine, heroin, Oxycodone, PCP, MDMA, and or Fentanyl;

AFFIDAVIT OF SAMUEL LANDIS - 19
USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

c. That drug traffickers and those who assist them maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code.  That drug traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients, and that records are maintained by such dealers and those who assist them so they can account for their drugs and the monies owed for these illegal drugs; that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where drug traffickers and those who assist them have ready access to them, i.e., homes, offices, automobiles and storage places;

d. That it is common for drug traffickers and those who assist them to conceal or secure drugs and other contraband, proceeds of drug sales and/or records of drug transactions, drug sources, and drug customers in secure locations within residences, businesses, offices, safe houses, garages, storage buildings, safes, vaults, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities;

e. That persons involved in drug trafficking and those who assist them conceal caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities in their residences, other safe houses, businesses, offices, garages, storage buildings, safes, vaults, safety deposit boxes and/or automobiles;

f. That drug traffickers and those who assist them often keep paraphernalia for packaging, cutting, weighing, manufacturing and distributing controlled substances, and that such paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, and aromatic substances such as soap, dryer sheets, wood shavings, heat sealers and plastic wrapping, which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs and law enforcement;

g. That it is common for drug traffickers and those who assist them to deal/possess stolen weapons or goods and exchange drugs for such weapons or goods, and these weapons are commonly used

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

by drug dealers as an item of investment and for protection from robberies by other drug dealers, and often are altered to fire fully automatic;

h.   That when drug traffickers and those who assist them collect proceeds from the sale of illegal drugs, they often attempt to legitimize these profits; that to accomplish this goal, drug traffickers use sources, including but not limited to, foreign and domestic banks and their attendant services, cashier's checks, money orders, wire transfers, and bank drafts;

i.   That persons involved in the distribution/sale, manufacture or smuggling/transportation of narcotics (i.e. drug trafficking) and persons who assist them often communicate with each other to further their drug trafficking activities. Such communications are most commonly accomplished via cellular telephone. Your affiant knows that drug traffickers and persons who assist them maintain contact telephone numbers, as well as other information such as names, nicknames, addresses, email addresses, photographs, video recordings, text messages and such, pertaining to their drug trafficking associates and coconspirators within the memory of their cellular telephone(s);

j.   That drug traffickers and those who assist them frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos in their residences, offices, cellular telephones, computers, other electronic data storage means and other places or devices under their control. Additionally, that this stored data can provide evidence of criminal activities as it is not an uncommon practice for persons engaged in drug trafficking to photograph and/or record themselves and other coconspirators engaging in activities that further their drug trafficking;

k.   That drug traffickers and those who assist them frequently employ the use of coded language and avoid explicit references to narcotics, locations, names, amounts, times and dates. Drug traffickers conduct most of their drug transactions in cash in order to avoid a paper trail of their drug transactions and proceeds. Drug traffickers go to extreme measures to avoid law enforcement surveillance and investigations, such as the development of aliases, use of false social security numbers, the use of varying cellular telephones, the use of pre-paid calling cards, the use of

other individuals' names and addresses (either true or fabricated) to subscribe to telephones, pagers, utilities, and to acquire assets, such as vehicles;

l.  That there are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous when considered alone (i.e. financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and page bills, keys to safe deposit boxes, computer hardware and software, text messages, voicemail messages, etc.) but has significant relevance when considered in light of other evidence.  The evidence may be highly valuable to the offender and at the same time be of usefulness for evidentiary purposes, such as valuable investments (i.e. art, jewelry, precious metals and stones, real estate, securities), large sums of currency, narcotics or money laundering ledgers, safes, customers lists, receipts or listed locations of storage facilities and/or safe houses, firearms, communications equipment (to include cellular telephones), vehicles, airplanes, vessels, computers;

m.  That drug traffickers and those who assist them often use/consume the drugs that they traffic and manufacture and/or use/consume other controlled substances, and it is not unusual to find personal use quantities of drugs and paraphernalia consistent with the use of these substances on their persons and on their property; and

n.  That drug traffickers and those who assist them often use numerous and various vehicles to conduct narcotics transactions, to store drugs, drug proceeds, and weapons, and to transport drugs from locations inside and outside the United States. These Mexican DTOs compartmentalize their efforts as measure to avoid law enforcement. Given that K. TORRES is located in the Greater Portland, Oregon Metropolitan area, and acts on behalf of Mexican-based leadership, I believe he does not yet possess the ability to communicate with the individuals pertaining to **Premises 2.** I also believe **Premises 2** and the individuals residing at this location continue operations (i.e., stash bulk cash

AFFIDAVIT OF SAMUEL LANDIS - 22

USAO: 2020R00108

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

and/or illicit narcotics) despite K. TORRES' arrest because of the current absent line of communication.

## **CONCLUSION**

52.     Based on the information developed during this investigation, your affiant believes the facts set forth, show **Premises 1 and/or Premises 2** are being used for the holding and distribution of controlled substances, including methamphetamine in the Western District of Washington, and/or for the holding and laundering of proceeds of the unlawful distribution of controlled substances. Your affiant believes JACOBO, K. TORRES, F. HERNANDEZ, VAZQUEZ, as well as others known and unknown to this investigation have committed violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Methamphetamine and Counterfeit Oxycodone Pills containing Fentanyl and/or Possession with Intent to Distribute Methamphetamine and Counterfeit Oxycodone Pills containing Fentanyl), 843, and 846 (Conspiracy to Distribute Methamphetamine (a Schedule II Controlled Substance)), and/or a violation of 18 U.S.C. § 1956 (Money Laundering). It is your affiant's belief that contraband and the evidence, fruits, and instrumentalities of these violations will exist in the residence, outbuildings, structures, contained on the properties known and described in Attachments A-1 and A-2, attached hereto and incorporated herein by reference.

//

//

//

AFFIDAVIT OF SAMUEL LANDIS - 23
USAO: 2020R00108

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

53.    WHEREFORE, your affiant respectfully requests that a search warrant be issued for the premises described in Attachments A-1, and A-2, authorizing any agent of the Drug Enforcement Administration (DEA), and/or other Federal, state, and local law enforcement personnel, to enter and search the premises for the items discussed in Attachment B, attached hereto and incorporated herein by reference.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

SAMUEL LANDIS, Affiant
Special Agent
Drug Enforcement Administration

The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone this 17th day of March, 2022.

HON. DAVID W. CHRISTEL
United States Magistrate Judge

AFFIDAVIT OF SAMUEL LANDIS - 24
USAO: 2020R00108

**ATTACHMENT "A-1"**

1. The residence located at **1900 NW 96th Street, Vancouver, Washington** is a single story residence with an attached garage, light brown in color, with brick trim and a light brown asphalt shingled roof. The residence is located on the north side of NW 96th Street. The number "1900" is located to the left of the front door. See attached photograph of the residence below:



2. Authority to search extends to all parts of the property, including main structure, garage(s), storage structures, outbuildings, and curtilage, and all vehicles, containers, compartments, or safes located on the property, whether locked or not, and the person of JACOBO, where the items described in Attachment B (list of items to be seized) could be found.

Attachment A - 1
USAO#: 2020R00108

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1

**ATTACHMENT "A-2"**

2

3      1. The residence located at **116 E Cedarcrest Street, Napavine,**

4  **Washington** is a two story residence with an attached garage, light blue in color, with

5  white trim and a dark asphalt shingled roof. The residence is located on the east side

6  of E Cedarcrest Street. The numbers "116" appear to the right of the front door. See

7  attached photograph of the residence below:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      2.  Authority to search extends to all parts of the property, including main

23  structure, garage(s), storage structures, outbuildings, and curtilage, and all vehicles,

24  containers, compartments, or safes located on the property, whether locked or not, and

25  the person of VAZQUEZ, where the items described in Attachment B (list of items to

26  be seized) could be found.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT "B"**

**Particular Things to be Seized**

Your affiant requests authorization to seize the following evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 1956:

a. Any and all controlled substances, including cocaine, heroin, methamphetamine, Oxycodone, PCP, MDMA, and Fentanyl, including in pill form, and paraphernalia for packaging, cutting, weighing, manufacturing, and distributing drugs. Such paraphernalia includes scales, plastic bags, and cutting agents used to adulterate the purity of controlled substances;

b. Firearms, firearms purchase and ammunition receipts, holsters, ammunition and ammunition boxes, firearm ownership documents, gun boxes, firearms cleaning kits;

c. Records relating to the purchase, importation, transportation, sale, distribution and possession of controlled substances, including but not limited to, customer lists, ledgers, log books, documents, receipts, financial statements, telephone notes, telephone answering machine tape recordings of messages from co-conspirators and other communication records, personal telephone and address books, credit records, diaries, airline tickets, passports, and money orders. The aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug traffickers have ready access to them: e.g, homes, offices and automobiles;

d. Photographs, including still photos, negatives, slides videotapes, films, undeveloped film, memory cards, and the contents therein, in particular photographs of co-conspirators, subjects posing with illegal firearms in their possession, of assets and/or controlled substances;

e. United States and foreign currency, financial instruments, income tax returns, safe deposit box keys and records, precious metals, jewelry, cryptocurrency wallets, including private keys and seed phrases, and other items of value which are the proceeds of drug transactions and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities in secure locations within their residences, offices, automobiles, garages, and storage buildings, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, gift cards, pre-paid visa cards, American Express Bluebird cards, money drafts, money orders, bank drafts, and cashier's checks, bank checks, safe deposit box keys, and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of money. Any and all records pertaining to the rental of self- storage locker units, post office boxes, U-Haul type trailers or trucks and rental properties;

f.  Records relating to the attempt by drug traffickers to legitimize profits from the sale of drugs relating to, for example, foreign banks and domestic banks, and their attendant services, cashier's checks, money drafts, real estate, and businesses real and fictitious;

g.  Records relating to vehicles which are used, or are intended to be used, to transport, convey, or facilitate the sale, distribution, transportation, importation and possession of controlled substances, and control of the locations and vehicles searched, including but not limited to, deeds, escrow documents, real estate records, leases, rental records, utility bill, telephone bills, personal telephone directories, photographs, keys, and documents reflecting ownership of automobiles, "pink slips", insurance records, repair bills, and service records. Indicia of occupancy, residency, rental and/or ownership of the premise described herein, including, but not limited to utility and telephone bills, concealed envelopes, rental, purchase or lease agreements and keys;

h.  Any cell phones. A supplemental search warrant must be requested and authorized before searching the cell phone.

i.  Any account holder information and access logs for storage units, and any payment of unit information.

Attachment B - 2

USAO# 2020R00108

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970